IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

| | | |
|---|---|---|
| DR. FIONA AXELSSON, | ) | |
| | ) | Case No:  3:22-cv-56-PDW-ARS |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **AMENDED COMPLAINT AND** |
| | ) | **DEMAND FOR JURY TRIAL** |
| UNIVERSITY OF NORTH DAKOTA | ) | |
| SCHOOL OF MEDICINE & HEALTH | ) | |
| SCIENCES; SANFORD; SANFORD | ) | |
| HEALTH; and NORTH DAKOTA | ) | |
| PROFESSIONAL HEALTH | ) | |
| PROGRAM, | ) | |
| | ) | |
| Defendants. | ) | |

## NATURE OF THE ACTION

1.     This is an action under Title VII of the Civil Rights Act of 1964, Title I of

the Civil Rights Act of 1991, the Americans with Disabilities Act, and state law causes of

action including breach of contract, tortious interference with contract, and defamation to

correct unlawful employment practices based upon sex discrimination, disability

discrimination, retaliation, and conspiracy that has been brought to provide appropriate

relief to Dr. Fiona Axelsson.

## PARTIES

2.     At all times relevant to this action Dr. Axelsson has been an employee

under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), the North

Dakota Human Rights Act ("NDHRA"), and the Americans with Disabilities Act

("ADA"). Dr. Axelsson is a citizen of Canada.

1

3.      At all times relevant to this action the University of North Dakota School of Medicine & Health Sciences (hereinafter "UND") has been an employer under Title VII, the NDHRA, and the ADA. UND is incorporated and has its principal place of business in North Dakota.

4.      At all relevant times Dr. Axelsson worked onsite at Sanford Health, a healthcare provider, at one of its locations in Fargo, North Dakota. Upon information and belief Sanford Health is the trade name for Sanford (collectively, "Sanford") with its principal office located at 801 Broadway North, Fargo, North Dakota. Both Sanford and Sanford Health are incorporated and have their principal places of business in North Dakota.

5.      At all times relevant to this action Sanford has been an employer under Title VII, the NDHRA, and the ADA.

6.      North Dakota Professional Health Program (hereinafter "ND PHP") is a non-profit located at 919 S. 7th St., Suite 305, Bismarck, North Dakota. ND PHP is incorporated and has its principal place of business in North Dakota.

## JURISDICTION AND VENUE

7.      This court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), as Plaintiff is a citizen of a foreign state and is not a permanent resident of the United States, Defendants are all headquartered and have their principal places of business in North Dakota, and the amount in controversy is more than $75,000, exclusive of interest and costs.

8.      Venue is proper in this District as the employment practices and conduct alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of North Dakota.

9.      Plaintiff timely filed Charges of discrimination and retaliation against both Defendants UND and Sanford with the Equal Employment Opportunity Commission (EEOC) and the North Dakota Department of Labor and Human Rights. Dr. Axelsson received the required Notices of Right to Sue from the EEOC (as to Sanford) and the U.S. Department of Justice (as to UND) and she has complied with all administrative requirements.

10.     Plaintiff timely filed a Notice of Claim Form with the North Dakota Director of OMB: Risk Management Division in Bismarck, North Dakota.

## FACTUAL BACKGROUND

11.     Dr. Axelsson is a physician who started as a family medicine medical resident under contract with Defendant UND in June of 2019. At all relevant times Dr. Axelsson has been working pursuant to a contract with UND.

12.     Dr. Axelsson is Canadian and entered the United States for her residency training on a J1 Visa.

13.     At all relevant times and by contractual agreement between Sanford and UND, Dr. Axelsson worked at Sanford Health, a healthcare provider, at one of its locations in Fargo, North Dakota. Upon information and belief, Sanford Health is the trade name for Sanford with its principal office located at 801 Broadway North, Fargo, North Dakota.

14.     Upon information and belief, UND and Sanford Health entered into an Affiliation Agreement. Under said Affiliation Agreement Sanford Health agreed to administer a family medicine residency program sponsored by UND. Said Affiliation Agreement purported to provide Dr. Axelsson with certain rights and work protections that Defendants UND and Sanford failed to provide to her.

### A. Dr. Axelsson's Initial Substantiated Report of Sexual Harassment by her Program Director

15.     During her first year of residency Dr. Axelsson had an exemplary work record.

16.     Dr. Jason Myrmoe, a Sanford employee, started as the Family Medicine Residency Program Director on or about July 1, 2020, and was Dr. Axelsson's boss. Dr. Myrmoe had been shadowing the previous Program Director for many months before officially starting his position.

17.     Dr. Myrmoe had started sexually harassing Dr. Axelsson while shadowing the previous Program Director and his harassment escalated when he was promoted to the Program Director position.

18.     The harassment began with comments from Dr. Myrmoe to Dr. Axelsson such as "you're too emotional" and "get some sleep." At the end of August 2020 each Resident had individual meetings with Dr. Myrmoe, ostensibly to give him their opinion on the program since he took over. While the first half of Dr. Axelsson's meeting with Dr. Myrmoe went fine, around the midpoint of the meeting Dr. Myrmoe asked if Dr. Axelsson had any questions. Dr. Axelsson said she did not appreciate how Dr. Myrmoe

had fired the Associate Program Director since she knew the Accreditation Council for Graduate Medical Education (hereinafter "ACGME") guidelines so well. Dr. Myrmoe snapped at Dr. Axelsson, got red in the face, gripped his chair and with white knuckles told Dr. Axelsson, "Tread carefully, Dr. Axelsson. Tread carefully." Dr. Axelsson felt threatened by Dr. Myrmoe because of this comment, and as a result Dr. Axelsson froze up, became quiet, and agreed with everything Dr. Myrmoe said for the next hour. Once Dr. Myrmoe had calmed down Dr. Axelsson asked for clarification on what he had meant and he snapped back with "Just tread carefully, Dr. Axelsson." Dr. Axelsson became extremely upset when she left Dr. Myrmoe's office as she was unsure if this was a threat to her career or her life.

19.    Additionally during his tenure as program director, Dr. Myrmoe repeatedly would check out Dr. Axelsson, other female Residents, and nurses while they were working at Sanford. At first Dr. Axelsson let it slide as she thought it was just typical male behavior. But as it continued and in conjunction with her experience surrounding her August 2020 meeting with Dr. Myrmoe she complained to Sanford Human Resources and UND's Title IX office about Dr. Myrmoe's harassing behavior.

20.    Sanford's HR department and UND's Title IX office did an initial investigation. After the investigation Dr. Axelsson was advised by Katlyn Toso of Sanford HR and Dr. Theige, Chair of Graduate Medical Education at Sanford, that their investigation had led them to find areas of improvement for Dr. Myrmoe and that Dr. Axelsson would no longer have to work alone with Dr. Myrmoe, including precepting with him or doing procedures with him.

21.     At her meeting with Katlyn Toso and Dr. Theige, Dr. Axelsson was told they would prefer she keep this all quiet.

## B. Despite Dr. Axelsson's Efforts,
## Dr. Myrmoe's Harassing Conduct Continued

22.     Despite the repeated assurances of Sanford's employees, Dr. Axelsson continued experiencing harassing conduct from Dr. Myrmoe.

23.     Between October 2020 and December of 2020 Dr. Axelsson was repeatedly put in uncomfortable positions with Dr. Myrmoe by Defendants UND and Sanford, despite having been promised she would not have to work with Dr. Myrmoe.

24.     Dr. Axelsson was still unclear what Dr. Myrmoe had meant by his threat and she lived in fear of what Dr. Myrmoe, her Program Director, might do to her or her career since she was in her medical residency training and those running the program maintained all the authority and power.

25.     Not only was the relationship between Dr. Axelsson and Dr. Myrmoe a quintessential boss/employee relationship, there was the added dynamic of Dr. Axelsson's dependence on staying in his good graces. There is historically a genuine power differential in the medical residency training program that serves to make residents particularly vulnerable and dependent on receiving good reviews from their program leadership for the future success of their professional careers. Dr. Axelsson found herself in in a similar position with UND and Sanford program leadership.

26.     Between July of 2020 and April of 2021 Dr. Axelsson had almost 20 meetings with UND and Sanford management regarding Dr. Myrmoe and his harassing conduct.

27.     On one occasion Dr. Axelsson was asked to do a trigger finger injection with Dr. Myrmoe after she had already found an alternate solution on her own so she would not have to do it with him.

28.     On still another occasion Dr. Axelsson was scheduled to place a birth control implant called a Nexplanon on a patient of hers and when there was no other preceptor available, Dr. Myrmoe went and did it himself without asking Dr. Axelsson if she was okay with that or if she'd prefer to have the patient rescheduled so that she could get the encounter and education of placing a Nexplanon. Dr. Axelsson was losing important and necessary educational opportunities because of these intentional actions of UND and Sanford.

29.     On one occasion Dr. Axelsson did a vasectomy procedure with Dr. Myrmoe and it went terribly because Dr. Axelsson's hands began shaking badly at the thought of debriefing with Dr. Myrmoe after the procedure. She eventually gave the instruments to Dr. Myrmoe to finish the procedures. Dr. Axelsson's vision was getting blurred as well and Dr. Axelsson later learned that these were normal reactions to trauma.

30.     There were more incidents that took place that included Dr. Axelsson's clinics being cancelled multiple times, often last minute, due to Defendants UND and Sanford not finding an alternate preceptor to Dr. Myrmoe as had been promised. This

failure by Defendants UND and Sanford negatively impacted Dr. Axelsson's education and professional training.

31.    As a result of Dr. Myrmoe's harassing conduct Dr. Axelsson began seeing a therapist for the first time in her life. She saw a Sanford therapist five times between September and March of 2021.

### C. Dr. Axelsson's Second Substantiated Report of Sexual Harassment by her Program Director

32.    Dr. Axelsson became so uncomfortable around Dr. Myrmoe that she started wearing long pants and long sleeve shirts/turtlenecks when she knew he would be around so she could try and avoid his regular leering at her.

33.    The sexual harassment of Dr. Axelsson by Dr. Myrmoe continued. On January 5, 2021, Dr. Axelsson came into the clinic where two of her colleagues were already sitting. Dr. Myrmoe walked in and said good morning. Dr. Axelsson turned to greet Dr. Myrmoe. Dr. Myrmoe proceeded to unashamedly check Dr. Axelsson out, moving his eyes up and down, very slowly, leering at her. Dr. Axelsson was so shocked and uncomfortable it took her a moment to find her voice and even say hello. When Dr. Myrmoe left the room Dr. Axelsson asked one of the others there if she was overreacting or was what happened really awkward and uncomfortable how Dr. Myrmoe had undressed her with his eyes. The other coworker agreed with Dr. Axelsson's assessment and confirmed that she was not overreacting and that Dr. Myrmoe had done that to her as well. A male co-resident witnessed this entire interaction.

34.     At that point another female Resident walked in and joined the conversation and stated that Dr. Myrmoe had also commented on her outfits before.

35.     After the January 5, 2021, incident Dr. Axelsson reported the sexual harassment by Dr. Myrmoe to both UND Title IX and Sanford HR. Upon receipt of her complaint, Sanford began a new investigation.

36.     Another negative result of UND's and Sanford's actions was that Dr. Axelsson's fellow residents were becoming increasingly unhappy with Dr. Axelsson complaining about her treatment and ruffling feathers and they began bullying, isolating, and ostracizing Dr. Axelsson.

37.     Dr. Axelsson was further isolated from her co-residents while being precepted by Dr. Lunde during Dr. Lunde's own clinic (when Dr. Myrmoe was the only other preceptor) as she would work from a different part of the clinic, thus leading residents to question why she was being treated differently. Because Dr. Axelsson was repeatedly told to "keep this quiet" she was unable to speak up for herself, leading to further isolation from other residents.

38.     Dr. Axelsson at times would confide with the then-Associate Program Director, Dr. Lara Lunde, about how difficult everything was and Dr. Lunde agreed that she could see the other Residents were bullying Dr. Axelsson. Despite these statements, neither UND nor Sanford took any steps to stop the bullying of Dr. Axelsson. Dr. Lunde is an employee of both Sanford and UND. Dr. Axelsson's fellow residents were now frightened that if Dr. Myrmoe was fired for all of what had transpired that the residents might then find themselves out of a residency program.

39.     In the meantime, Dr. Axelsson continued to work with Dr. Myrmoe, despite the assurances of Sanford HR that she would not have to do so.

40.     Finally, in early February of 2021 Sanford HR and UND GME met with Dr. Axelsson and advised her that they found her allegations of sexual harassment against Dr. Myrmoe to be true. They also informed Dr. Axelsson that other women had come forward with similar accusations against Dr. Myrmoe.

41.     The program was not terminated. In fact, the day following Dr. Axelsson's meeting with Sanford HR and UND GME Dr. Myrmoe sent an email to every Resident stating he was resigning effective immediately as Program Director and that Dr. Lunde would be taking over.

42.     This was not Dr. Myrmoe's first run-in with the Sanford HR department. Upon information and belief Dr. Myrmoe was known to give nurses unwelcome and unsolicited backrubs at work. Upon information and belief, prior to becoming the Family Medicine Residency Program Director Dr. Myrmoe had been required to undergo some form of sensitivity training before he was permitted to come work at the Family Medicine Residency program and because of prior behavioral issues at a different Sanford location.

43.     Upon information and belief, both Sanford and UND were on notice of Dr. Myrmoe's propensity to sexually harass females who worked both with him and for him. Despite this knowledge, UND and Sanford hired Dr. Myrmoe as the family medicine residency Program Director, leading a residency program that placed him in contact with the young women enrolled in the program, including Dr. Axelsson.

44.     Dr. Axelsson had put UND and Sanford on notice of Dr. Myrmoe's sexually harassing behavior as program director in her July 27, 2020 email to Dr. David Theige and her August 5, 2020, email to Dr. Kimberly Becker. Dr. Axelsson had specifically advised UND, her employer, that she had experienced sexual assault and intimate partner violence from former partners. This was Dr. Axelsson's personal history that was known to her residency program management, of which Dr. Myrmoe was the Program Director.

45.     Dr. Axelsson had also previously advised Dr. Myrmoe of her own OCD and anxiety issues. This knowledge was admitted by Dr. Myrmoe when at one point during a residency meeting in early August 2020, he used this information against her in front of the faculty, residents and management – her peers and mentors. After an interaction between them, Dr. Axelsson specifically asked Dr. Myrmoe not to use her mental health against him.

46.     Dr. Myrmoe, a Sanford employee and manager, as well as the UND Family Residency Program Chair, knew, or should have known, of Dr. Axelsson's difficult past and mental health issues before he intentionally harassed her on multiple occasions.

47.     Sanford's own second investigation into Dr. Axelsson's second January 5, 2021, sexual harassment complaint against Dr. Myrmoe revealed that Dr. Lara Lunde, a colleague of Dr. Myrmoe and the Assistant Program Director at the time, had told the investigator on January 11, 2021, that Dr. Myrmoe had given her an unsolicited back massage in the presence of another medical resident and two nurses. This unsolicited back massage had been given to Dr. Lunde just a few weeks earlier and after Dr.

Axelsson's earlier initial complaint of sexual harassment against Dr. Myrmoe filed with UND and Sanford.

48.    Dr. Lunde also told the Sanford investigator on January 11, 2021, that she had just met with Dr. Myrmoe and shared with him that the residents did not trust him and that he was offending residents with his personality. Dr. Lunde recounted how she had recently told Dr. Myrmoe that she worries about his interactions with women and also told him he could not have a 1:1 with a female resident without her present.

49.    After Dr. Axelsson's sexual harassment complaint against Dr. Myrmoe was substantiated, Dr. Myrmoe was taken out of his role as Program Director by Sanford management in early February of 2021, and simply transferred to his former Sanford Clinic. Dr. Myrmoe should have been fired so that he could no longer sexually harass female employees.

50.    After being harassed by Dr. Myrmoe, complaining and forcing UND and Sanford to take action for his illegal harassing behavior, Dr. Axelsson was then pulled aside by Dr. Lunde, who had now replaced Dr. Myrmoe as the Program Director, only a few days after Dr. Myrmoe had resigned as Program Director in February of 2021 and told that she needed to just be careful for the next little while so as to not get herself in trouble. Dr. Lunde told Dr. Axelsson she should "let the dust settle" after bringing her second complaint of harassment against Dr. Myrmoe. Dr. Lunde made it clear to Dr. Axelsson that she needed to keep quiet and for the sake of her own career and keep what happened to herself. Dr. Lunde told Dr. Axelsson that this direction was coming from the

top (at Sanford). When Dr. Axelsson asked who the top was, Dr. Lunde told her "the President of Sanford."

51.     Dr. Axelsson, who had been courageous and done the right thing by reporting the Program Director's sexually harassing behavior, was now being retaliated against and warned by her new Program Director to keep quiet after she had been harassed by the previous Program Director.

52.     UND and Sanford knew, or should have known, of the harassing behavior of Dr. Myrmoe, a Sanford employee and the UND Family Residency Program Director. After Defendants' own investigation substantiating the sexual harassment it led to Dr. Myrmoe, the harasser, being "removed" from his position as Program Director. He was removed, not fired, and sent back to continue working at his former Sanford clinic.

### D. The Fallout from Dr. Axelsson's Experiences

53.     The length of time and effort it took for Dr. Axelsson to be heard, as well as the continuing harassing behavior, led to Dr. Axelsson having mental health struggles as a result of being the victim of sexual harassment by her boss, the Program Director. She had become severely depressed and suicidal. Dr. Axelsson was diagnosed with PTSD and substance use disorder. She had started to binge drink on weekends in order to try and cope with the harassment and forget what was happening to her at work.

54.     Dr. Axelsson contacted her therapist and confided that there was something wrong because she was depressed and suicidal for the first time in her life. Dr. Axelsson's therapist recommended treatment and Dr. Axelsson told Dr. Lunde about the recommendation.

55.     Dr. Axelsson was open with her employer about her mental health issues.

56.     Dr. Axelsson voluntarily sought treatment and went out on approved medical leave in April of 2021. Dr. Axelsson had not had a prior diagnosis of PTSD until after being sexually harassed by the UND Family Medicine Program Director.

57.     As a result of the harassment, stress and retaliation Dr. Axelsson suffered a severe mental breakdown. She was hospitalized from April 20, 2021, through August 30, 2021. Dr. Axelsson was advised as part of her treatment that the chronic nature of all the things going on with Dr. Myrmoe put her into "survival mode" for the eight months she was working with him, and only after she was no longer working with him was it finally safe for her to let her guard down, and that's when everything unraveled.

58.     When Dr. Axelsson was struggling as a result of being harassed she contacted ND PHP at the insistence of her Program Director, Dr. Lunde. ND PHP purports to "facilitate the rehabilitation of healthcare providers who have physical or mental health conditions that could compromise public safety and to monitor their recovery."[1]However, as further detailed below, ND PHP's role in Dr. Axelsson's recovery has not been one of facilitation; instead, it has been one of impediment, obstruction, and false accusations.

59.     Dr. Axelsson was initially hesitant to enroll in the monitoring agreement with ND PHP but Dr. Lunde implored her to sign up. Owing largely to the fact that her program director – whom she needed to have on her side for her future career aspirations – strongly recommended that she enroll in the program, Dr. Axelsson contacted ND PHP.

---

[1] https://ndphp.org/about-us/, last accessed March 30, 2022.

60.     After completing her inpatient treatment and contacting ND PHP, Dr. Axelsson was required to enter into a long-term monitoring agreement with ND PHP that had significant expectations, requirements and ramifications related to her testing and treatment in advance of her returning to work. She signed her monitoring agreement on September 16, 2021.

61.     The monitoring agreement included requirements for both ND PHP and Axelsson. This monitoring agreement – drafted by ND PHP – was a contract between Axelsson and ND PHP.

62.     Dr. Axelsson complied with the requirements of ND PHP and was cleared to return to work in the fall of 2021. However, due to the conduct of ND PHP, UND, and Sanford, this never happened.

### E. Instead of Returning Her to Work, UND and Sanford Retaliated Against Dr. Axelsson and Prevented Her from Continuing Her Medical Career

63.     In October 2021, Dr. Axelsson filed complaint against the program with the ACGME, referenced above. The ACGME is a private, non-profit organization that sets the standards for US graduate medical education (residency and fellowship) programs and the institutions that sponsors them and renders accreditation decisions based on compliance with these standards.

64.     On October 27, 2021, just days after Dr. Axelsson filed her complaint with the ACGME, UND and Sanford made their first attempt at removing Dr. Axelsson from the program.

15

65.     In this instance, UND and Sanford told Dr. Axelsson that the provision in her monitoring agreement that recommended Dr. Axelsson have a chaperone during clinical encounters was not a reasonable accommodation under the ADA, and they gave her until November 10, 2021, to have her return-to-work recommendations updated.

66.     This assertion was made despite Dr. Axelsson having already previously advised both ND PHP and Dr. Lunde that her own treatment providers were in agreement that a chaperone (as UND and ND PHP had previously required) was no longer required.

67.     This October 27, 2021 letter was responded to by Dr. Axelsson on October 29, 2021. In that email, Dr. Axelsson reminded Dr. Lunde that her providers believed no chaperone was required and also advised Dr. Lunde that she would be returning to her original treatment center for reevaluation since ND PHP wanted the recommendation from her original treatment center, this, despite Dr. Axelsson's own provider's being uniformly of the opinion that no chaperone was required.

68.     In the email, Dr. Axelsson requested a direct response to this October 29, 2021 email. Dr. Axelsson never received a substantive response from UND to her October 29, 2021, email and request for a response.

69.     Dr. Axelsson – at the insistence of ND PHP – arranged for and paid for a reevaluation at her original treatment center, which is located in Mississippi. The treatment center wanted Dr. Axelsson to return there for a week. Dr. Axelsson did everything asked of her by the treatment center while there from November 1, 2021, through November 8, 2021.

16

70.     Dr. Axelsson provided ND PHP, UND, and Sanford the requested and required return-to-work written recommendations from the treatment center on November 10, 2021. Importantly, the recommendations of the treatment center specifically provided Dr. Axelsson could practice in her residency without a chaperone.

71.     Her providers and her original treatment facility uniformly rejected the need for a chaperone, and this information was provided – again – to UND, Sanford, and ND PHP before their deadline of November 10.

72.     Despite doing what was requested and what was required within the requested timeframe, and despite being cleared to return to work and requesting a return to work on November 10, 2021, UND and Sanford continued to retaliate against Dr. Axelsson and refused to accommodate her or allow her to return to work in the program.

73.     Despite repeated requests to return to work and her clinical training as part of the residency program pursuant to her contract with UND, Dr. Axelsson was prevented by UND and Sanford from returning to work because of her known disability of PTSD which was diagnosed after the prolonged nature of the harassment by Dr. Myrmoe, and in retaliation for her having reported being sexually harassed by her Program Director, and for having filed a complaint with the ACGME.

74.     ND PHP has repeatedly refused to amend her monitoring agreement despite directives to do so from her medical professionals, has pushed Dr. Axelsson to see providers who are not the best treatment options for her, and has effectively provided radio silence on repeated requests for them to uphold their end of the monitoring agreement and "facilitate the rehabilitation of" Dr. Axelsson. ND PHP has failed to do

their part, severely hampering and hindering Dr. Axelsson's ability to continue her medical career.

75.     ND PHP's website – the public statements they make about their services – avers, "The approval for a return to practice is based on recommendations from treatment providers."[2] ND PHP did not adhere to this policy when dealing with Dr. Axelsson, to the detriment of her career and her contracts with UND and Sanford.

76.     On March 30, 2022, ND PHP sent a letter to the North Dakota Board of Medicine accusing Dr. Axelsson of failing to comply with her monitoring agreement and implying to the State's medical licensing board that she has been covering up alcohol use, reported as "many positive breathalyzer tests." This despite acknowledged malfunction of the breathalyzer that Dr. Axelsson was using, Dr. Axelsson's repeated follow up urinalyses that have not shown alcohol metabolites, and Dr. Axelsson having submitted to her own testing of a hair sample on March 3, 2022 that showed no alcohol consumption in the past 180 days (since September 4, 2022, or before the beginning of her monitoring agreement) and providing those results to ND PHP on March 11, 2022.

77.     ND PHP knew Dr. Axelsson had lab results showing no alcohol consumption during the entirety of her monitoring agreement, knew or should have known that it was likely the breathalyzer that was malfunctioning, and yet reported to Dr. Axelsson's licensing board that she continues to have positive breathalyzer tests.

---

[2] https://ndphp.org/faqs/, FAQs About North Dakota Professional Health Program, "Can Participants Practice Medicine?", last accessed March 30, 2022.

78.     Dr. Axelsson has not worked since April 10, 2021. She was eligible to return to work in September 2021. She has received disability income of $2,000/month, less than half of her contracted salary amount with UND, and has lost income as a result of her discriminatory and retaliatory treatment by UND and Sanford.

79.     As a result of Dr. Axelsson's high-quality work as a medical resident she was recruited by Sanford Clinic North in Perham, Minnesota, to work for them upon the completion of her residency. She signed a contract dated October 23, 2020, with them to begin her employment on or about July 11, 2022. The contract was to pay Dr. Axelsson a substantial annual income, plus incentives and benefits.

80.     As part of the incentive to get Dr. Axelsson to sign the above-referenced contract she was provided recruitment loans by Sanford Clinic North and Perham Hospital (d/b/a Perham Health). The intent was that the loans would be forgiven over time as Dr. Axelsson began working under the terms of her contract.

81.     As a result of Sanford's retaliatory actions and breach of Dr. Axelsson's contract set to begin on or about July 1, 2022, Dr. Axelsson has sustained significant lost earnings and potential future earnings and benefits.

82.     After Dr. Axelsson had been sexually harassed by UND's Program Director, also a Sanford employee, and complained about it to both Sanford and UND, and after she had requested a reasonable accommodation and was cleared to return to work in September 2021, Sanford sent her a November 16, 2021, letter accusing her of not fulfilling the conditions precedent of the above referenced contract and that the contract was void.

83.     Dr. Axelsson was notified by Perham Health that Sanford Health had notified them that they had rescinded Dr. Axelsson's Staff Physician Agreement and that she was no longer under an employment contract with them.

84.     Sanford Clinic North and Perham Health subsequently advised Dr. Axelsson that her recruitment loans were now due and payable in full.

85.     The above November 16, 2021, letter from Sanford was sent to Dr. Axelsson despite her having been out on approved leave for several months seeking medical treatment because Sanford's employee and UND's Program Director had sexually harassed her. This despite Dr. Axelsson having been willing and able to return to work since early September of 2021 and having been prevented by Defendants UND and Sanford conspiring to prevent her from returning to work and her medical residency training.

86.     Sanford's retaliation and breach interfered with and prevented Dr. Axelsson from fulfilling the terms of her agreement with Perham Health.

87.     Upon information and belief, during the time Dr. Axelsson was out on approved medical leave after being sexually harassed by her Program Director and Sanford's employee, Sanford conducted an "investigation" of Dr. Axelsson to gather negative information about Dr. Axelsson to remove Dr. Axelsson from the residency program. This "investigation" was in retaliation for Dr. Axelsson complaining to Sanford and UND about being sexually harassed and complaining to the ACGME as set out above.

88.     On the basis of their retaliatory investigation, Sanford unilaterally removed Dr. Axelsson from her medical residency program and notified UND, not Dr. Axelsson, of its actions by letter to UND residency program leadership dated January 3, 2022. The alleged reasons all related to Dr. Axelsson's conduct more than 8 months prior, and were pretextual and manufactured in retaliation for Dr. Axelsson's complaining about being sexually harassed by the Program Director, complaining to the ACGME and trying to secure a reasonable accommodation to return to work.

89.     UND did not dispute Sanford's action to remove Dr. Axelsson but conspired with them to dismiss her from the residency program by letter dated January 13, 2022.

90.     UND failed to provide Dr. Axelsson the procedural due process and contract protections she was required to receive and entitled to under her contract with UND.

91.     Dr. Axelsson timely appealed her January 13, 2022, dismissal from the UND Family Medical Residency Program. After a hearing, the Hearing Panel (comprised of physicians employed or associated with Defendants UND and Sanford) ruled in Dr. Axelsson's favor and on February 12, 2022, recommended the UND Family Medicine Residency Program and Dr. Axelsson seek to find creative options to facilitate Dr. Axelsson's resuming of her training. The Hearing Panel decision intentionally provided that Dr. Axelsson should have until July 1, 2022 to find a training site to continue her clinical training, at UND or elsewhere, and if that was not possible then the UND Program Director's decision to dismiss her would be upheld after July 1, 2022.

92.     Medical residents are dependent on their programs to advocate for them, particularly when something is outside the normal realm of residency training. Dr. Axelsson's training experience at UND and Sanford is clearly outside the "normal" residency training experience. Consequently, Dr. Axelsson needed Dr. Lunde's assistance in finding a new program. Dr. Lunde has consistently refused to assist, despite the Hearing Panel's decision and her own obligations in her role as Program Director and a fellow physician.

93.     Dr. Axelsson is a Canadian citizen in the United States working in the medical residency program under a J1 visa. If Dr. Axelsson's illegal dismissal from the UND residency program is allowed to go into effect July 1, 2022, she has been advised by those associated with the J1 visa administration that she will be unable to stay in the United States and continue her medical residency training in the United States. This would result in Dr. Axelsson sustaining significant professional and financial damages. Both UND and Sanford were advised of these restrictions.

94.     After receiving the Hearing Panel decision Dr. Axelsson tried for two weeks to engage UND and Sanford in discussions regarding creative options to facilitate the resumption of her medical residency training. After hearing nothing from UND or Sanford for two weeks she received an email from Dr. Lunde, the Program Director, setting out the limited make-shift terms of engagement they would permit Dr. Axelsson to partake in, with no clinical work or opportunity to continue in the residency. The same email also provided Dr. Axelsson with a February 28, 2022, letter of non-renewal of her UND residency contract. This email and non-renewal letter from UND was contrary to

the Hearing Panel's recommendation and constituted yet additional retaliatory action and conspiracy by UND and Sanford against Dr. Axelsson.

95.    Dr. Axelsson timely appealed the February 28, 2022 non-renewal action by UND.

96.    UND and Sanford conspired to deprive Dr. Axelsson equal protection of the laws or equal privileges under the laws and as a result Dr. Axelsson was injured and deprived of certain rights or privileges.

97.    ND PHP intentionally and repeatedly failed to perform its role in Dr. Axelsson's return to work, as they would not make modifications or addendums to the requirements for Dr. Axelsson to return to work despite Dr. Axelsson's own treating health care providers uniformly having recommended that she no longer needed to have a chaperone. These modifications would have permitted Axelsson to return to work.

98.    ND PHP not only refused to modify the requirements in opposition to their own stated policies, ND PHP conveyed that and other misinformation to UND, which adversely impacted Dr. Axelsson's contract and employment with UND.

99.    This refusal to modify the monitoring agreement by ND PHP resulted in UND and Sanford characterizing the requested accommodations of having a chaperone with Dr. Axelsson during her encounters with male patients as an "unreasonable accommodation" that they could not accommodate. Had ND PHP adopted the recommendations of Dr. Axelsson's providers – as they were required to do – Dr. Axelsson would not have needed a chaperone and UND and Sanford's assertion that the chaperone was an unreasonable accommodation would have been moot.

23

100.    UND and Sanford's assertion that the chaperone was an unreasonable accommodation was in fact a pretextual reason for discriminating against Dr. Axelsson.

101.    The above acts, omissions, and recommendations taken by ND PHP were not made in good faith.

102.    As a result of the above described retaliatory and discriminatory conduct of UND, Sanford, and ND PHP, each of them, and together have prevented Dr. Axelsson from returning to work as a resident physician, both at UND/Sanford and, most likely, anywhere in the United States.

## COUNT I
## CLAIM OF SEX DISCRIMINATION AGAINST UND

103.    Plaintiff reincorporates by reference paragraphs 1 through 102 and incorporates them herein.

104.    Defendant UND's actions as set forth above constitute discrimination against Plaintiff in violation of Title VII, as amended, 42 U.S.C.§2000e-(a)(1).

## COUNT II
## CLAIM OF SEX DISCRIMINATION AGAINST SANFORD

105.    Plaintiff reincorporates by reference paragraphs 1 through 102 and incorporates them by reference.

106.    Defendant Sanford's actions as set forth above constitute discrimination against Plaintiff in violation of Title VII, as amended, 42 U.S.C.§2000e-(a)(1).

**COUNT III**
**CLAIM OF RETALIATION AGAINST UND**

107.    Plaintiff reincorporates by reference paragraphs 1 through 102 and

incorporates them herein.

108.    Defendant UND's actions as set forth above constitute discrimination

against Plaintiff in violation of Title VII, as amended, 42 U.S.C.§2000e-3(a).

**COUNT IV**
**CLAIM OF RETALIATION AGAINST SANFORD**

109.    Plaintiff reincorporates by reference paragraphs 1 through 102 and

incorporates them herein.

110.    Defendant Sanford's actions as set forth above constitute discrimination

against Plaintiff in violation of Title VII, as amended, 42 U.S.C.§2000e-3(a).

**COUNT V**
**STATE CLAIM OF SEX DISCRIMINATION AGAINST UND**

111.    Plaintiff reincorporates by reference paragraphs 1 through 102 and

incorporates them herein.

112.    Defendant UND's actions as set forth above constitute discrimination

against Plaintiff in violation of the NDHRA, §14-02.4-01 and 14-02.4-03.

**COUNT VI**
**STATE CLAIM OF SEX DISCRIMINATION AGAINST SANFORD**

113.    Plaintiff reincorporates by reference paragraphs 1 through 102 and

incorporates them herein.

114.    Defendant Sanford's actions as set forth above constitute discrimination

and retaliation against Plaintiff in violation of the NDHRA, §14-02.4-01 and 14-02.4-03.

## COUNT VII
## STATE CLAIM OF RETALIATION AGAINST UND

115.    Plaintiff reincorporates by reference paragraphs 1 through 102 and incorporates them herein.

116.    Defendant UND's actions as set forth above constitute discrimination and retaliation against Plaintiff in violation of the NDHRA, §14-02.4-18.

## COUNT VIII
## STATE CLAIM OF RETALIATION AGAINST SANFORD

117.    Plaintiff reincorporates by reference paragraphs 1 through 102 and incorporates them herein.

118.    Defendant Sanford's actions as set forth above constitute discrimination and retaliation against Plaintiff in violation of the NDHRA, §14-02.4-18.

## COUNT IX
## CLAIM OF CONSPIRACY AGAINST UND

119.    Plaintiff reincorporates by reference paragraphs 1 through 102 and incorporates them herein.

120.    Defendant UND's actions as set forth above constitute a conspiracy to interfere with Plaintiff's civil rights in violation of 42 U.S.C. §1985(3).

## COUNT X
## CLAIM OF CONSPIRACY AGAINST SANFORD

121.    Plaintiff reincorporates by reference paragraphs 1 through 102 and incorporates them herein.

122.    Defendant Sanford's 's actions as set forth above constitute a conspiracy to interfere with Plaintiff's civil rights in violation of 42 U.S.C. §1985(3).

## COUNT XI
## CLAIM OF DISABILITY DISCRIMINATION AGAINST UND

123.    Plaintiff reincorporates by reference paragraphs 1 through 102 and incorporates them herein.

124.    Defendant UND's actions as set forth above constitute a violation of the ADA in violation of 42 U.S.C. §12112.

## COUNT XII
## CLAIM OF DISABILITY DISCRIMINATION AGAINST SANFORD

125.    Plaintiff reincorporates by reference paragraphs 1 through 102 and incorporates them herein.

126.    Defendant Sanford's actions as set forth above constitute a violation of the ADA in violation of 42 U.S.C. §12112.

## COUNT XIII
## CLAIM OF RETALIATION UNDER THE ADA AGAINST UND

127.    Plaintiff reincorporates by reference paragraphs 1 through 102 and incorporates them herein.

128.    Defendant UND's actions as set forth above constitute retaliation against Plaintiff in violation of the ADA, 42 U.S.C. §12203.

## COUNT XIV
## CLAIM OF RETALIATION UNDER THE ADA AGAINST SANFORD

129.    Plaintiff reincorporates by reference paragraphs 1 through 102 and incorporates them herein.

130.    Defendant Sanford's actions as set forth above constitute retaliation against Plaintiff in violation of the ADA, 42 U.S.C. §12203.

## COUNT XV
## STATE CLAIM OF DISABILITY DISCRIMINATION AGAINST UND

131.    Plaintiff reincorporates by reference paragraphs 1 through 102 and

incorporates them herein.

132.    Defendant UND's actions as set forth above constitute disability

discrimination against Plaintiff in violation of the NDHRA, §14-02.4-01 and 14-02.4-03.

## COUNT XVI
## STATE CLAIM OF DISABILITY DISCRIMINATION AGAINST SANFORD

133.    Plaintiff reincorporates by reference paragraphs 1 through 102 and

incorporates them herein.

134.    Defendant Sanford's actions as set forth above constitute disability

discrimination against Plaintiff in violation of the NDHRA, §14-02.4-01 and 14-02.4-03.

## COUNT XVII
## STATE CLAIM OF RETALIATION AGAINST UND

135.    Plaintiff reincorporates by reference paragraphs 1 through 102 and

incorporates them herein.

136.    Defendant UND's actions as set forth above constitute discrimination and

retaliation against Plaintiff based on their requesting a reasonable accommodation in

violation of the NDHRA, §14-02.4-18.

## COUNT XVIII
## STATE CLAIM OF RETALIATION AGAINST SANFORD

137.    Plaintiff reincorporates by reference paragraphs 1 through 102 and

incorporates them herein.

138.    Defendant Sanford's actions as set forth above constitute discrimination and retaliation against Plaintiff based on their requesting a reasonable accommodation in violation of the NDHRA, §14-02.4-18.

## COUNT XVIV
## BREACH OF CONTRACT CLAIM AGAINST UND

139.    Plaintiff reincorporates by reference paragraphs 1 through 102 and incorporates them herein.

140.    Defendant UND, by its actions as set forth above, breached its Resident/ Fellow contract of employment with Plaintiff, signed by Plaintiff on April 7, 2021.

## COUNT XX
## TORTIOUS INTERFERENCE WITH CONTRACT CLAIM
## AGAINST SANFORD

141.    Plaintiff reincorporates by reference paragraphs 1 through 102 and incorporates them herein.

142.    Defendant Sanford, by its actions as set forth above, interfered with Plaintiff's Resident/Fellow contract of employment with UND and she was damaged.

## COUNT XXI
## TORTIOUS INTERFERENCE WITH CONTRACT CLAIM
## AGAINST SANFORD

143.    Plaintiff reincorporates by reference paragraphs 1 through 102 and incorporates herein.

144.    Defendant Sanford, by its actions as set forth above, interfered with Plaintiff's contract with Perham Health and she was damaged.

## COUNT XXII
## BREACH OF CONTRACT CLAIM AGAINST SANFORD

145.    Plaintiff reincorporates by reference paragraphs 1 through 102 and incorporates herein.

146.    Defendant Sanford, by its actions as set forth above, breached its October 23, 2020, employment contract with Plaintiff through Sanford Clinic North and she has been damaged.

## COUNT XXIII
## NEGLIGENT HIRING CLAIM AGAINST SANFORD

147.    Plaintiff reincorporates by reference paragraphs 1 through 102 and incorporates herein.

148.    Defendant Sanford, by its actions as set forth above, negligently hired Dr. Myrmoe as its family practice residency program director and as a result, Plaintiff has been damaged.

## COUNT XXIV
## NEGLIGENT HIRING CLAIM AGAINST UND

149.    Plaintiff reincorporates by reference paragraphs 1 through 102 and incorporates herein.

150.    Defendant UND, by its actions as set forth above, negligently hired Dr. Myrmoe as its family practice residency program director and as a result, Plaintiff has been damaged.

## COUNT XXV
## TORTIOUS INTERFERENCE WITH CONTRACT CLAIM AGAINST ND PHP

151.   Plaintiff reincorporates by reference paragraphs 1 through 102 and incorporates them herein.

152.   Defendant ND PHP, by its actions as set forth above, interfered with Plaintiff's Resident/Fellow contract of employment with UND.

## COUNT XXVI
## BREACH OF CONTRACT CLAIM AGAINST ND PHP

153.   Plaintiff reincorporates by reference paragraphs 1 through 102 and incorporates by reference.

154.   Defendant ND PHP, by its actions as set forth above, breached its Monitoring Agreement and Addendums contract with Plaintiff.

## COUNT XXVII
## DEFAMATION CLAIM AGAINST ND PHP

155.   Plaintiff reincorporates by reference paragraphs 1 through 102 and incorporates by reference.

156.   Defendant ND PHP, by its actions as set forth above, has defamed Plaintiff, both verbally and in writing, and these communications have injured or have a tendency to injure Plaintiff in her occupation.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court:

A.   Order Defendants UND and Sanford to make Plaintiff whole by providing appropriate backpay with prejudgment interest, in amounts to be determined at

31

trial, and other affirmative relief, including front pay, necessary to eradicate the effects of its unlawful employment practices;

B. Order Defendants UND and Sanford to make Plaintiff whole by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices described herein, including but not limited to emotional pain and suffering, loss of enjoyment of life and humiliation in amounts to be determined at trial;

C. Order Defendants to pay Plaintiff for the damages she has sustained as a result of their breach of contracts with Plaintiff in amounts to be determined at trial;

D. Order Defendants Sanford and ND PHP to pay Plaintiff for the damages she has sustained as a result of their tortious interference with her employment contract with UND.

E. Award Plaintiff her costs, disbursements and attorney's fees as permitted by law; and,

F. Grant such other relief as the court deems just and equitable.

## <u>JURY TRIAL DEMAND</u>

Plaintiff requests a jury trial on all questions of fact raised by her complaint.


Dated this 6th day of May, 2022.          **FIEBIGER LAW, LLC**

by: <u>s/Thomas D. Fiebiger</u>
Thomas D. Fiebiger, ND ID # 04190
6800 France Ave. S., Suite 190
Edina, MN 55435
612.399.6474
Attorney for Plaintiff

**VERIFICATION**

The undersigned Plaintiff has reviewed the Complaint and knows or believes that all

allegations that the Plaintiff has personal knowledge of to be true. The Plaintiff believes

the allegations that the Plaintiff does not have personal knowledge to be true based on

specified information, documents or both. I declare under penalty of perjury that the

foregoing is true and correct.

_____          Dated: ___5/5/2022_____

Fiona Axelsson

33